# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON


PHYLLIS KENNEDY,                                    :

                              Plaintiff,

             -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                         Defendant.          :

Case No. 3:11-cv-218

District Judge Walter Herbert Rice
Magistrate Judge Michael R. Merz

---

## REPORT AND RECOMMENDATIONS

---

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial

gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on February 16, 2001, alleging disability since starting on the same date. (Tr. 156-59). The Commissioner denied Plaintiff's application initially and on reconsideration. (Tr. 60-61). Administrative Law Judge Daniel Shell held a hearing, (Tr. 71; 38-49), and subsequently determined that Plaintiff was not disabled. (Tr. 18-32). The Appeals Council denied Plaintiff's request for review, (Tr. 17; 4-6), and Judge Shell's decision became the Commissioner's final decision. See *Kyle v. Commissioner of Social Security,* 609 F.3d 847, 854 (6th Cir. 2010). Plaintiff filed a complaint in this Court seeking judicial review of the Commissioner's decision. *Kennedy v. Astrue,* No. 3:05CV415, filed Dec. 5, 2005 (Doc. 2) ("*Kennedy I*") . On March 12, 2007, the Court remanded the matter to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings. *Kennedy I, supra*, at Doc. 13, 14; see

also, Tr. 416; 418-36.

On remand, Judge Shell held a hearing, (Tr. 609-53), following which he again found that Plaintiff was not disabled. (Tr. 392-413). The Appeals Council denied Plaintiff's request for review and Judge Shell's decision became the Commissioner's final decision. See *Kyle, supra.* Plaintiff filed an action in this Court seeking judicial review of the Commissioner's decision. *Kennedy v. Astrue,* No. 3:08-cv-144, filed April 30, 2009 (Doc. 2)(*"Kennedy II"*). On October 8, 2009, the Court remanded the matter to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings. *Kennedy II, supra,* at Doc. 9, 11, 12; see also, Tr. 688-720.

On remand, Administrative Law Judge Thomas McNichols held a hearing and a supplemental hearing, (Tr. 1181-1220; 1221-1253), following which he determined that Plaintiff is not disabled. (Tr. 656-81). The Appeals Council denied Plaintiff's request for review and Judge McNichols decision became the Commissioner's final decision. See *Kyle, supra.* This action followed.

In his decision, Judge McNichols noted that during the period of time Plaintiff's February, 2001, application has been pending, specifically in May, 2008, Plaintiff filed a new application for SSD and an application for SSI again alleging disability since February 16, 2001. See Tr. 680. Judge McNichols noted that those applications were addressed in a separate decision. *Id.* n. 1.

In addressing Plaintiff's February, 2001, application, Judge McNichols found that she met the insured status requirements of the Act through September 30, 2009. (Tr. 663, ¶ 1). Judge McNichols also found that through her date last insured, Plaintiff had severe chronic neck and

back pain secondary to spinal sprain/strain with underlying mild degenerative disc disease, cerebral aneurysm, recurrent headache with occasional vision deficits of unknown etiology, possibly related to cerebral aneurysm, hepatitis C, and depressive disorder, but that she did not have an impairment or combination of impairments that met or equaled the Listings. (Tr. 664, ¶ 3; Tr. 672, ¶ 4). Judge McNichols found further that through the date last insured, Plaintiff had the residual functional capacity to perform a limited range of light work. (Tr. 673, ¶ 5). Judge McNichols then used sections 202.14 and 202.21 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that prior to the date she was last insured, there was a significant number of jobs in the economy that Plaintiff was capable of performing. (Tr. 680, ¶ 10). Judge McNichols concluded that prior to her date last insured, Plaintiff was not disabled and therefore not entitled to benefits under the Act. (Tr. 681, ¶ 11). The Appeals Council denied Plaintiff's request for review and Judge McNichols decision became the Commissioner's final decision. See *Kyle, supra.*

The voluminous record reveals that Plaintiff has a history of a cervical spine fracture which she sustained in an automobile accident in 1988. (Tr. 44; 46). Plaintiff underwent a surgical repair of the fracture and over time she recovered well. *Id.* In February, 2001, Plaintiff sustained a work-related injury to her cervical spine which aggravated her prior injury. (Tr. 46-47). In addition to her history of a cervical spine injury, in 2004, laboratory tests revealed that Plaintiff had hepatitis C, (Tr. 564), and in March, 2008, a CT scan revealed that Plaintiff had a 4x5 mm. aneurysm in her left middle cerebral artery. (Tr. 977-78).

Plaintiff consulted with orthopedist Dr. Lehner in December, 2001, and January, 2002, and on April 22, 2002, he reported that he had seen Plaintiff for her back problem, her

physical examination was fairly benign, she had a normal neurological examination, and that an MRI revealed some degenerative changes with some very minimal bulging and no encroachment on the cord of the C3-4 and C4-5 discs with some irregularity at those levels with some arthritis. (Tr. 237-39). Dr. Lehner also reported that a nerve conduction study was normal, a CT scan of the cervical spine revealed that the spinal canal and foramen were wide open, and that the objective findings did not coincide with her complaints. *Id.*

The record contains a copy of MedWork Occupational Health Care physician Dr. Gamm's treatment notes dated February 27, 2001, through May 6, 2002. (Tr. 254-345). Those notes reveal that Dr. Gamm began treating Plaintiff after her work-related cervical spine injury. *Id.* When he first examined Plaintiff, Dr. Gamm noted that she had a reduced range of motion of her cervical and lumbar spines, tenderness and spasm from the cervical spine down to the trapezius through both shoulders and down through the thoracolumbar area, decreased range of motion of her arms and shoulders bilaterally, was able to heel and toe walk but was unstable and had balance problems, and that x-rays showed degenerative lipping in the lumbar and cervical spine as well as wiring and effusion at the C6-7 level. *Id.* Dr. Gamm reported that Plaintiff's diagnoses were cervicothoracic/thoracolumbar strain with spasm with radiculopathy of both arms, probably involving C8 distribution and a possible finding of carpal tunnel syndrome bilaterally and status post cervical fusion. *Id.*

Plaintiff participated in physical therapy at MedWork. *Id.* Plaintiff continued to receive treatment from Dr. Gamm who referred her to pain management. *Id.* Over time, Dr. Gamm noted that Plaintiff had diffuse tenderness throughout her cervical spine and the thoracic region extending into the trapezius region, symmetric reflexes, diminished grasp reflex, and decreased

ranges of cervical and lumbar motions, and he limited her to working for four hours a day/twelve hours a week, "no strenuous activity", and a ten-pound lifting limit. *Id.*

Dr. Gamm referred Plaintiff to neurologist and pain specialist Dr. Demirjian who reported on March 16, 2002, that Plaintiff's examination was normal except for a few trigger points in her neck and lumbar back area. *Id.* Dr. Demirjian recommended that Plaintiff participate in a four-week pain rehabilitation program. *Id.*

Plaintiff enrolled in the recommended pain program on April 29, 2002, at which time it was noted that Plaintiff reported that it was not her goal to return to her previous work as a nurse and that she drank three to four beers a day including with medications. (Tr. 246-52). It was also noted that Plaintiff " does not want to work" and that she engaged in exaggerated behaviors. *Id.* Plaintiff was discharged from the program on May 3, 2002, when she complained of increased symptoms and felt that alternative medicine would be much more beneficial. *Id.*

Examining psychologist Dr. Bromberg reported in October, 2002, that Plaintiff's mood and energy appeared normal, she was not tearful, did not appear hopeless or helpless, appeared to have poor self-esteem, denied feeling depressed, and did not complain of symptoms of anxiety. (Tr. 352-56). Dr. Bromberg also reported that Plaintiff was alert with good concentration, was oriented, had adequate judgment and fair insight, worked as a bartender, previously worked as an L.P.N. for ten years, her diagnosis was pain disorder associated both with psychological factors and a general medical condition, and that her GAF was 58. *Id.* Dr. Bromberg opined that Plaintiff's abilities to relate to others, maintain attention and concentration, and withstand the stress of day-to-day work activity were mildly impaired and that her ability to understand, remember, and follow instructions was not impaired. *Id.*

Plaintiff was hospitalized November 8-11, 2002, for treatment of organic mood disorder due to drugs and/or alcohol, personality disorder, paranoid, and somatoform disorder. (Tr. 569-85). At the time of admission, it was noted that Plaintiff had taken an overdose of medications, was drinking beer, and had written a suicide note. *Id.* During that hospitalization, Plaintiff reported that she had no desire for psychiatric treatment, did not want to take psychiatric medication, did not want to follow with a psychiatrist, and did not want to participate in any kind of substance abuse program. *Id.* At the time Plaintiff was discharged, it was noted that Plaintiff had a substance abuse problem in spite of her denial, that she was evasive and vague, was in massive denial, and that she was heavily into somatization. *Id.*

The record contains a copy of treating physician Dr. Dunlap's office notes dated May 13, 2002, through January 15, 2004. (Tr. 371-81). Those notes reveal that Dr. Dunlap treated Plaintiff for low back and neck pain. *Id.* On January 21, 2003, Dr. Dunlap reported that Plaintiff had reduced ranges of motion of all spinal areas with associated muscle spasm of all spinal regions along with neuritis of the upper extremities with activity, that she was able to lift/carry up to ten pounds occasionally and five pounds frequently, stand/walk and sit each for three hours in an eight hour day and for one-half hour without interruption, and that she was not capable of performing sedentary, light, or medium work on an eight-hour day basis. (Tr. 377-380A). On January 22, 2004, Dr. Dunlap reported that Plaintiff was able to work four hours every other day and that if she worked more than that, she got upper lumbar pain and stiffness. (Tr. 381). Dr. Dunlap also reported that Plaintiff's bartending duties were off-hours with a light workload while nurses usually worked eight to twelve hours a day, spent those hours on their feet with little time to sit, and that they had to lift, bend, stoop, pull, and tug. *Id.*

Examining physician Dr. O'Connell reported on January 21, 2004, that Plaintiff had hepatomegaly with general abdominal tenderness, spider angiomas on her torso, clubbing of the fingers bilaterally, and that her balance was poor due to low back pain. (Tr. 382-91). Dr. O'Connell also reported that Plaintiff was not able to heel/toe walk, squat, or rise from squat, had decreased ranges of lumbar and cervical spinal motions, a normal neurological examination, negative straight leg raising, pain on palpation of the cervical spine, and that there were no spasms. *Id.* Dr. O'Connell noted that Plaintiff was oriented, had a flat affect, was fatigued, was reluctantly cooperative, and that her diagnoses were cervical spondylosis with degenerative disc disease, status post cervical fusion for correction of fractured vertebrae, and hepatomegaly. *Id.* Dr. O'Connell opined that Plaintiff suffered from a combination of impairments that prevented her from performing substantial gainful activity on more than a part-time basis, that she was limited to working no more than four hours a day or twelve hours a week, and that she was able to lift/carry up to ten pounds occasionally and five pounds frequently, stand/walk for three hours in an eight-hour day and for fifteen minutes without interruption, sit for three hours in an eight-hour day and for one hour without interruption, and that she was not able to perform sedentary, light, or medium work for an eight-hour day. *Id.*

The record contains additional treatment notes from Dr. Dunlap dated December, 2003, through August, 2007. (Tr. 484-89; 532-36). Those notes reveal that Dr. Dunlap continued to treat Plaintiff for back and neck pain. *Id.*

Examining physician Dr. Smith reported on June 20, 2007, that Plaintiff had a decreased range of cervical spine motion, normal strength in her upper extremities, normal grasp, manipulation, pinch, and fine coordination, weak dynamometry readings in both hands which

9

appeared to be voluntary, decreased ranges of motion of her dorsal lumbar spine, and that testing strength in both lower extremities was not reliable. (Tr. 490-504). Dr. Smith also reported that Plaintiff displayed weakness in her feet when on the examining table, but when she walked across the floor there was no evidence of weakness, that she was able to raise up on her toes and heels without difficulty, she had positive straight leg raisings, and that her reflexes were 1+ bilaterally in knees and ankles. *Id.* Dr. Smith identified Plaintiff's diagnoses as multi-level cervical spondylosis, lumbar spondylosis, degenerative disc disease thoracic T3-4 and T4-5, residual fracture dislocation C-7, and hepatitis C. *Id.* Dr. Smith opined that Plaintiff had very little objective neurological deficit, displayed some symptom magnification, had very little objective evidence on her exam, and that she may have impairment of lifting and carrying objects, but no impairment sitting, walking, handling objects, hearing, speaking, or traveling. *Id.* Dr. Smith also opined that Plaintiff was able to lift/carry up to twenty pounds occasionally and ten pounds frequently, sit, stand, and walk each for one hour in an eight-hour day, sit and stand for fifteen minutes without interruption, and walk for thirty minutes without interruption. *Id.*

The record contains a copy of Plaintiff's treatment notes from the Cassano Health Center dated March 21, 2005, through February 22, 2007. (Tr. 505-14). Those notes reveal that Plaintiff's health care providers treated her for hepatitis C and a breast disorder for which she underwent a ductectomy. *Id.*; see also, Tr. 537-51.

A June 8, 2007, MRI of Plaintiff's cervical spine revealed disc desiccation at multiple levels, a broad-based bilobed disc bulge at the C3-4 level, mild central stenosis, and moderate right and mild left stenosis. (Tr. 517). An MRI of Plaintiff's thoracic spine also performed on June 8, 2007, revealed mild desiccation at multiple levels, anterior osteophytosis, a

minimal broad-based disc bulge at the T3-4 and T4-5 levels, no stenosis, and no herniation. (Tr. 518). On that same date, an MRI of Plaintiff's lumbar spine revealed a broad-based disc bulge more eccentric towards the left at the L4-5 level, mild left and moderate right foraminal stenosis with associated facet and ligamentous hypertrophy, mild to moderate broad-based disc bulge more eccentric toward the right at the L5-S1 level, mild central canal stenosis, and moderate right and mild left foraminal stenosis with associated facet and ligamentous hypertrophy. (Tr. 519).

The record contains a copy of Plaintiff's treatment notes from the Corwin Nixon Health Center dated November 30, 2004, through June 1, 2007. (Tr. 552-68). Those notes reveal that Plaintiff's health care providers at that facility monitored and/or treated her for various medical complaints and conditions including hepatitis C, depression, fatigue, and nausea. *Id.*

Dr. Dunlap continued to treat Plaintiff and reported on September 6, 2007, that Plaintiff had marked diminished range of motion of the cervical spine, mild diminished motion of the dorsal spine, and moderate diminished range of motion of the lumbar spine, and muscle spasms about the entire spinal areas including the sacrum, and that her diagnoses were degenerative disc disease of the cervical, dorsal, and lumbar spinal areas, degenerative joint disease in multiple areas of the cervical, dorsal, and lumbar spinal areas, moderate foraminal stenosis on the right of C3-4 and C4-5 and in the lumbar areas at L4-5 and L5-S1, and post laminectomy and fusion C6-T1. (Tr. 594-606). Dr. Dunlap opined that Plaintiff's prognosis was poor as her symptoms had progressed and she was showing another area of moderate foraminal stenosis at C4-5. *Id.*

Plaintiff consulted with neurosurgeon Dr. West on April 2, 2008, at which time Dr. West noted that Plaintiff reported daily headaches frequently with nausea and vomiting, some blurred vision, and photophobia. (Tr. 899-900). Dr. West also noted that Plaintiff's March 12,

2008, CT-angiogram revealed a 4-5 mm intracerebral aneurysm at the distal M1 segment. *Id.* Dr. West reported that Plaintiff displayed no sensory or motor deficits, had 2/4 and equal reflexes and he identified Plaintiff's diagnosis as left middle cerebral artery aneurysm. *Id.* Dr. West opined that Plaintiff's headaches were not coming from the aneurysm, but that she should have the aneurysm addressed. *Id.*

Examining psychologist Dr. Kramer reported on July 21, 2008, that Plaintiff earned her GED and eventually a degree in nursing, she was oriented, appeared to be in good contact with reality, showed no evidence of any thought disorder, and appeared to be of average intelligence. (Tr. 909-14). Dr. Kramer also reported that Plaintiff displayed no acute emotional distress, was spontaneous but tended to be rather vague and evasive especially about her psychological symptoms, had a somewhat muted and subdued affect, reported some depression, displayed no symptoms of anxiety, and that her judgment and insight were somewhat uneven, although she possessed sufficient judgment and insight to live independently and make decisions regarding her future. *Id.* Dr. Kramer noted that Plaintiff had difficulty accounting for her time and describing her activities of daily living, and he identified her diagnoses as depressive disorder NOS, cognitive disorder NOS, and personality disorder NOS and he assigned her a GAF of 65. *Id.* Dr. Kramer opined that Plaintiff's abilities to relate to others, understand, remember, and follow instructions, maintain attention, concentration persistence, and pace to perform simple and repetitive tasks, and to withstand the stress and pressures associated with day-to-day work activities were slightly impaired. *Id.*

The record contains Plaintiff's treatment notes from the Mayfield Clinic where Dr. Ringer treated Plaintiff during the period May 28, 2008, through February 10, 2009. (Tr. 951-69). Those records reveal that Dr. Ringer reported Plaintiff had a 4mm left MCA aneurysm, that the

aneurysm did not explain her headaches or neck pain, that it posed a low risk of spontaneous hemorrhage, and that he recommended a course of observation. *Id.*

The record contains additional treatment notes from the Corwin Nixon Health Center dated January 25, 2007, through February 12, 2009. (Tr. 970-1006). Those notes reveal that Plaintiff continued to receive treatment at that facility for various medical conditions and complaints including back pain, depression, cerebral aneurysm, and hepatitis C. *Id.* In March, 2008, Dr. Franer, Plaintiff's health care provider at the Health Center, reported that Plaintiff's diagnoses were chronic hepatitis C, cerebral aneurysm, and depression, that her health status was deteriorating, her abilities to stand/walk and sit were not affected by her impairments, she was able to lift/carry up ten pounds frequently and up to twenty pounds occasionally, she was unemployable, and that her abilities to perform work-related mental activities were not significantly limited except that her abilities to carry out detailed instructions and to maintain attention and concentration were moderately limited. *Id.*

Plaintiff sought treatment from Dr. Moncrief at the Ohio Neurosurgical Institute during the period April 28, 2008, and March 10, 2009, and his treatment notes are in the record. (Tr. 1007-17). An April 28, 2008, arteriogram revealed an approximately 4mm aneurysm in Plaintiff's left middle cerebral artery and it was determined that Plaintiff was not a candidate for a coiling procedure due to the aneurysm's wide neck. *Id.* Dr. Moncrief reported on May 22, 2008, that Plaintiff's examination was negative, that her diagnosis was cerebral aneurysm of the left middle cerebral artery which was not amendable to coiling, and that he had offered Plaintiff surgical intervention. *Id.*

Dr. Franer reported on May 14, 2009, that Plaintiff's abilities to perform work-related mental activities were not significantly to moderately limited and that Plaintiff was not employable.

(Tr. 1040).

Dr. Dunlap reported on July 2, 2008, that Plaintiff's diagnoses were inoperable left middle cerebral artery aneurysm, post cervical laminectomy syndrome, cervical spine DJD and foraminal stenosis, lumbar foraminal stenosis, hepatitic C, chronic pain, depression, headaches, neuropathy, and chronic low back pain, that her status was deteriorating, and that she was able to stand/walk for ten minutes in an hour, sit for fifteen minutes in an hour, and lift/carry no weight. (Tr. 1041-42). Dr. Dunlap opined that Plaintiff was unemployable. *Id.*

Dr. Moncrief reported on October 14, 2009, that Plaintiff returned for reevaluation and to discuss surgical clipping of the cerebral artery aneurysm. (Tr. 1049). Dr. Moncrief instructed Plaintiff to advise him when she was ready to proceed with the surgery. *Id.*

Plaintiff consulted with Dr. Adib at Dayton Head & Neck Surgeons in September and October, 2009, for evaluation and treatment of laryngoesophageal reflux, hoarseness, and cough. (Tr. 1050-54). Dr. Adib treated Plaintiff with medication and gastroesophageal precautions. *Id.*

Plaintiff continued to receive treatment at the Corwin Nixon Clinic during the period October 23, 2008, through January 24, 2011. (Tr. 1056-76; 1101-1118; 1139-51). That treatment was for various medical conditions and complaints including cough, hypertension, bronchitis, allergic rhinitis, back pain, and depression. *Id.*

Plaintiff continued to treat with Dr. Dunlap through December 29, 2009. (Tr. 1077-79).

An MRA of Plaintiff's head performed on January 4, 2010 revealed a stable 0 .4 x 0.3 cm left MCA bifurcation aneurysm. (Tr. 1080).

Dr. Adib reported from February 5, 2010, through February 11, 2011, that Plaintiff's

examination was normal and that her diagnoses were laryngoesophageal reflux, hoarseness, and cough. (Tr. 1098-1100; 1152-66).

Examining physician Dr. Kennington reported on July 1, 2010, that Plaintiff had some tenderness to palpation in the lower part of the cervical spine, some decreased range of cervical motion, normal grip and muscle strengths, scattered rhonchi and wheezes, some tenderness to palpation over the right upper quadrant of the abdomen with guarding and that she had tenderness to palpation over the lumbar spine with decreased range of motion. (Tr. 1120-34). Dr. Kennington also reported that Plaintiff had a normal gait, performed tandem gait with difficulty, was able to perform toe and heel walking with difficulty, and that her neurological exam was normal. *Id.* Dr. Kennington noted that Plaintiff's diagnoses were brain aneurysm, status post previous CVA two times, arthritis, status post neck fracture with resultant neck surgery, cervical cancer status post hysterectomy, hepatitis C, chronic pain, and chronic headache disorder due to the aneurysm. *Id.* Dr. Kennington noted that Plaintiff manifested some slowness of her thought processes, that her work-related restrictions included no moderate or heavy lifting, carrying, pushing, or pulling, that she could perform light lifting, carrying, pushing, and pulling, that her standing and walking should be limited to brief periods of time no more than thirty minutes at a time with adequate periods of time allowed for rest, that her sitting, handling objects, hearing, and speaking would be unaffected, and that traveling would be difficult in light of her diagnosis of aneurysm and her chronic pain. *Id.* Dr. Kennington opined that Plaintiff was able to lift up ten pounds occasionally, was not able to carry any weight due to her pain, was able to sit and stand each for ten minutes without interruption and for one hour in an eight-hour day and walk for five minutes without interruption and for one hour without interruption, and that although she used a walking stick, it was not medically

15

necessary.  *Id.*

Dr. Ringer reported on February 18, 2010, and again on July 27, 2010, that Plaintiff's recent MRA showed no change in her left middle cerebral artery aneurysm and that no treatment was necessary at that time.  (Tr. 1136-37).

The medical advisor (MS) testified at the supplemental hearing that he had reviewed the record, several physicians had provided conclusory statements which were not supported by any examinations, and that Plaintiff did not satisfy the Listings.  (Tr. 1237-43).  The MA also testified that Plaintiff was able to lift/carry twenty pounds occasionally and  ten pounds frequently, and that she had no other exertional limitations.  *Id.*  The MA testified further that Plaintiff complained of headaches constantly and that it was possible that she had pain from her various minor abnormalities.  *Id.*

In her Statement of Errors, Plaintiff essentially alleges that the Commissioner erred in his weighing of the opinion evidence by relying on the opinions of non-examining physicians to the exclusion of those of the examining physicians and her treating sources, by failing to analyze the opinion evidence and explain the results of that analysis, by focusing on her lumbar testing and failing to properly account tor the objective/clinical evidence which documents her severe cervical spine problems and supports the opinions of the reviewing and treating physician that her limitations are disabling, and by improperly evaluating her credibility.  (Doc. 12).

In his decision, Judge McNichols reviewed the medical evidence of record and acknowledged that Plaintiff has several severe impairments.  (Tr. 664-70).  Judge McNichols specifically noted that Plaintiff has severe neck and back pain secondary to spinal sprain/strain with underlying mild degenerative disc disease and that she previously had a cervical spine fusion.  *Id.*

Judge McNichols also recognized that Plaintiff has severe cerebral aneurysm, recurrent headaches with occasional vision deficits possibly related to the aneurysm, hepatitis C, and a depressive disorder. *Id.* Nevertheless, Judge McNichols determined that the evidence before him contained numerous and widely varying assessments of Plaintiff's abilities and that the medical opinions ranged between an ability to perform light work to complete disability. (Tr. 673). The question, of course, is whether Judge McNichols properly weighed that evidence and, in particular, whether he had an adequate basis for rejecting the opinions of Plaintiff's treating physicians.

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406, *quoting, Wilson,* 378 F.3d at 544. "On the other hand, a Social Security

Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 582 F.3d at 406, *citing, Wilson,* 378 F.3d at 544, *citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07, *citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the

FN 1. Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Blakley,* 581 F.3d at 407, *citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

In rejecting Dr. Gamm's and Dr. Dunlap's opinions that Plaintiff is essentially disabled, Judge McNichols noted that in *Kennedy II,* the court found that the Commissioner had properly determined that those physicians' opinions were neither well supported by objective medical data nor consistent with other medical evidence or record. (Tr. 674). Judge McNichols noted further that the court determined that the Commissioner's error was his failure to continue weighing those physicians' opinions in accordance with the Regulations namely the examining relationship and the treatment relationship in terms of its frequency and duration, supportability, consistency, and specialization. *Id.,* citing 20 C.F.R. § 404.1527(d) & (f); Social Security Ruling 96-2p. Judge McNichols then determined that Drs. Gamm's and Dunlap's opinions were not entitled to controlling or even great weight..(Tr. 676). This Court cannot say that Judge McNichols erred in that regard.

As noted above, most of the objective test results, specifically nerve conduction tests, CT scans, and MRIs, revealed, at worst, mild to moderate findings. In addition, those objective test

results, specifically the EMG, cast doubt on Dr. Gamm's opinion that Plaintiff had neuropathy and radiculopathy as well as Dr. Dunlap's opinion that Plaintiff had neuritis. Thus, the paucity of positive findings on the objective tests provided a basis for declining to give Drs. Gamm's and Dunlap's opinions controlling weight. In addition, Dr. Gamm, who treated Plaintiff during the period February 2001 through May 2002 reported, at worst, reduced ranges of motion and diffuse tenderness. Similarly, Dr. Dunlap reported that Plaintiff exhibited, at worst, reduced ranges of motion and some muscle spasm.

In contrast to Drs. Gamm's and Dunlap's opinions, orthopedic specialist Dr. Lehner reported that Plaintiff's examination was fairly benign and that she had a normal neurological examination. Neurologist and pain specialist Dr. Demirjian reported that Plaintiff's examination was normal except for a few trigger points. Neurosurgeon Dr. West and neurosurgeon Dr. Moncrief both reported that Plaintiff neurological examinations were essentially normal. Further, treating physician Dr. Franer opined that Plaintiff had no limitations on her abilities to sit or stand/walk and that she was capable of performing light level lifting. In addition to being inconsistent with the findings of the various specialists as well as treating physician Dr. Franer's opinion, Drs. Gamm's and Dunlap's opinions are inconsistent with the reviewing physicians' and the MA's opinions.

While it is arguable that examining physicians Drs. Smith and Kennington's opinions support Drs. Gamm's and Dunlap's opinions, Judge McNichols gave several reasons for rejecting those physicians' opinions. (Tr. 665, 667). Specifically, and as Judge McNichols noted, Dr. Smith and Dr. Kennington rendered opinions that are internally inconsistent. For example, although Dr. Smith opined that Plaintiff had no impairment in her ability to sit or walk, without explanation, he also opined that Plaintiff was not able to sit, walk, or stand each for more than one hour. In addition,

Dr. Smith reported that Plaintiff engaged in symptom magnification. Similarly, Dr. Kennington reported that Plaintiff's examination was essentially negative and opined that she had no restriction in her ability to sit and that her only restriction with respect to standing/walking was that she take a break every thirty minutes. However, without explanation, he also reported that Plaintiff was able to stand/walk for only fifteen minutes at a time and for a total of two hours in an eight-hour day. Those internal inconsistencies provided the Commissioner with a basis for declining to give great, or even any, weight to Drs. Smith's and Kennington's opinions.

Under these facts, the Commissioner properly evaluated treating physicians Drs. Gamm's and Dunlap's opinions and had adequate bases for rejecting those opinions.

Plaintiff argues next that the Commissioner erred in his evaluation of her credibility.

It is, of course, for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247 (6th Cir. 2007)(citations omitted). An administrative law judge's credibility findings are entitled to considerable deference and should not be lightly discarded. *See, Villarreal v. Secretary of Health and Human Services,* 818 F.2d 461 (6th Cir. 1987); *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230 (6th Cir. 1993). Determination of credibility related to subjective complaints rests with the ALJ and the ALJ's opportunity to observe the demeanor of the claimant is invaluable and should not be discarded lightly. *Gaffney v. Bowen,* 825 F.2d 98 (6th Cir. 1987).

However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Rogers, supra* (citation omitted). Rather, such determination must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms or their intensity and persistence are not supported by objective medical

evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.* The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.* Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

First, as noted above, the Commissioner had adequate bases for rejecting Dr. Gamm's and Dr. Dunlap's opinions. Specifically, they are not supported by the objective medical evidence of record and are inconsistent with the opinions of the other evidence of record. Likewise, Plaintiff's allegations are not supported by the objective medical evidence and are inconsistent with the many reports of mild to normal physical findings. That is precisely what Judge McNichols found. (Tr. 677-79). In addition, Judge McNichols noted that Plaintiff had received primarily conservative care, that she worked part-time and engaged in various activities of daily living, and that during examinations, she engaged in give-away weakness and symptom magnification. *Id.* These are all factors that the Commissioner may properly consider when evaluating credibility. Judge McNichols did not err in his evaluation of Plaintiff's credibility.

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v.*

*Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

May 14, 2012

s/ **Michael R. Merz**
United States Magistrate Judge


# NOTICE  REGARDING  OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).